UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| GEORGES CHAPES, III, <br><br> Appellant, <br><br> v. <br><br> PRO-PAC, INC., <br><br> Appellee. | Case No. 11-CV-1076-JPS <br><br><br> ORDER |

On November 22, 2011, appellant Georges Chapes ("Chapes") appealed a decision by the United States Bankruptcy Court for the Eastern District of Wisconsin ("bankruptcy court") ruling that Chapes, a former employee of appellee Pro-Pac, Inc. ("Pro-Pac"), breached his fiduciary duty to Pro-Pac by steering a business opportunity – known as the "Vangard deal" – to one of its competitors, WOW Logistics Company ("WOW"). Chapes raises two issues on appeal: (1) whether the bankruptcy court erred in finding that Chapes breached a fiduciary duty to Pro-Pac; and (2) whether the bankruptcy court erred in awarding punitive damages against Chapes. The court affirms the decision of the bankruptcy court in both respects.

1.  Background

The facts on appeal are largely undisputed and are taken from the bankruptcy court's memorandum decision. Linda Sarna and David Sarna incorporated Pro-Pac in 1999 as a packaging business. Eventually, they desired to expand and diversify the business to include warehousing and transportation business lines. In furtherance of this goal, in June of 2005, Pro-Pac hired Chapes as the vice president of sales. Chapes was a family friend and was well-connected in the industry. Chapes received a salary of $84,000,

a company vehicle, an expense account, and health insurance. In comparison, other salesmen received a base salary of $52,000 plus commission of 2% to 4%.

In August of 2005, Pro-Pac subleased a 148,250-square foot warehouse facility in East Troy, Wisconsin, from WOW. WOW is a third party logistics service provider, operating public warehouses in Wisconsin, Illinois, and Idaho and brokering transportation services for customers around the country. Around the time Pro-Pac subleased the East Troy warehouse, WOW was seeking to exit southeast Wisconsin markets, but to expand its operations in Illinois.

In early 2006, WOW asked Pro-Pac if it would be interested in leasing another warehouse in Grafton, Wisconsin. David Sarna traveled to Grafton on April 6, 2006, to discuss the deal with WOW. Jamie Wally ("Wally"), WOW's senior vice president of sales and marketing, attended the meeting and raised WOW's use of Chapes as a consultant to develop business for WOW in Illinois. Sarna later testified that he was taken aback when Wally "made a comment…about us not minding if they were using [Chapes] to fill some warehouse space." Sarna noted that Chapes had never revealed he was sharing information and contacts with WOW. Sarna confronted Chapes about his contact with WOW. Chapes explained that Wally had approached him about filling warehouse space for WOW in Madison and that he was just appeasing Wally until Pro-Pac made a decision regarding the Grafton facility. Sarna was upset and told Chapes, "from this point forward…if you are working with WOW or there's something going on, I need to know what's happening. They're our landlord. This is too close to home." Sarna said Chapes agreed and apologized. The Grafton warehouse sublease never

materialized, but WOW's comments regarding Chapes's assistance in filling warehouse space for WOW sparked further negotiations between the two companies.

In these negotiations, Sarna sought lease concessions from WOW at the East Troy facility in exchange for permitting Chapes to consult with WOW. On July 17, 2006, Sarna sent an email to Wally detailing his demands for a workable agreement. According to this email, Sarna's objective was to increase revenues for WOW in its open buildings, and then to "put a true partnership together to successfully go after" an opportunity in Melrose Park, Illinois. Sarna noted that while he was open to risk and willing to allow Chapes to assist WOW, his priority was to grow his own business and that "[Chapes] plays heavily into those plans and is a very expensive and valuable asset to Pro-Pac." As compensation for sharing this "valuable resource," Sarna requested three months of free rent each year, and an extension of the lease term for an additional two years at the current rate of $38,500 per month. Sarna confirmed that Chapes was involved in the decision to seek the rent concessions, and wrote that the rent concessions approach minimized the risk that Chapes's assistance to WOW might jeopardize Pro-Pac and ensured that Pro-Pac's relationship with Chapes remained "open and honest."

Over the next several weeks, the companies continued to negotiate some type of agreement including rent concessions for Pro-Pac in exchange for Chapes's assistance to WOW. However, no mutually agreeable deal could be reached, and as of August 9, 2006, Pro-Pac and WOW agreed to table the idea for the present time. When the negotiations concluded without a deal, Sarna told Chapes not to have contact with Wally, stating: "We're done with

these guys. We've wasted enough time. I don't want you to do anything with them." According to Sarna, Chapes agreed. In his own testimony, Chapes denied that Sarna placed any limits on his discussions with WOW. However, the bankruptcy court found Sarna's testimony more credible and relied on it in making this finding of fact. As Chapes has not contested this fact on appeal, the court accepts it as true.

In the meantime, while negotiations were still taking place – on August 2, 2006 – George Van Denend ("Van Denend"), the president of Vangard Distribution, Inc. ("Vangard"), telephoned Chapes. Chapes had known Van Denend for many years. Indeed, when interviewing with Sarna for a position with Pro-Pac, Chapes touted Van Denend as one of his prize contacts – citing his potential as an "ally" for Pro-Pac. Van Denend called Chapes with a request from Tom Pelafas, Vangard's director of sales and marketing. Apparently, one of Vangard's largest customers was seeking a warehouse near Chicago to store 500 to 700 semi-truckloads of sugar. The sugar would be arriving by the end of August, but Vangard needed to know within 24-hours whether the space could be secured. Chapes suggested that Van Denend contact WOW. Chapes then called Wally at WOW to inform him of the "Vangard deal" and told him to contact Pelafas.

When the Vangard deal surfaced, WOW was in the process of finalizing a lease – which would go into effect in October of 2006 – for a warehouse in Aurora, Illinois. To accommodate the Vangard account on short notice, WOW quickly negotiated a short term lease to use the Aurora facility before October 1, 2006. WOW successfully secured the Vangard account and continues to store sugar in the Aurora facility.

Although Pro-Pac and WOW were in the midst of discussions for WOW's use of Chapes's consulting services, neither Chapes nor WOW ever mentioned the Vangard deal to Pro-Pac. Even after the negotiations ended, and Sarna had told Chapes not to have any further contact with WOW, telephone logs indicated numerous phones calls between Chapes and Wally throughout August 2006. Then, without Pro-Pac's knowledge, beginning in August of 2006, WOW began to issue checks to Chapes in compensation for the Vangard deal. WOW sent him a total of $6,490 – representing 2% of the gross revenues on the Vangard account through March of 2007. Additionally, after Pro-Pac filed its Chapter 11 petition, Sarna wrote to Wally asking that he be included in any conversations with Chapes. Yet, Chapes and Wally continued to speak unbeknownst to Sarna, via a disposable cell phone paid for by WOW. Chapes became an employee of WOW in early 2007. With these facts in mind, the court now turns to the issues at hand.

2. Legal Standard

On appeal, a district court may affirm, modify, reverse, or remand a bankruptcy court's judgment, order, or decree. Fed. R. Bankr.P. 8013. Factual findings are reviewed under a clearly erroneous standard, and conclusions of law are reviewed *de novo*. Fed. R. Bankr.P. 8013; *In re Newman*, 903 F.2d 1150, 1152 (7th Cir.1990).

3. Discussion

As previously discussed, Chapes challenges the bankruptcy court's decision that he breached his fiduciary duty to Pro-Pac as well as its decision to award $50,000 in punitive damages against Chapes. The court will consider each issue in turn.

### 3.1 Breach of Fiduciary Duty

To prove a claim for breach of fiduciary duty, a plaintiff must establish that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breach caused the plaintiff's damage. *Berner Cheese Corp. v. Krug,* 2008 WI 95, ¶ 40, 312 Wis.2d 251, 270, 752 N.W.2d 800, 809. Thus, the first question is whether Chapes owed Pro-Pac a fiduciary duty of loyalty as its employee.

#### 3.1.1 Fiduciary Relationship

The duty of loyalty extends to employees who are not corporate officers or directors. *See InfoCorp, LLC v. Hunt,* 2010 WI App 3, ¶ 21, 323 Wis.2d 45, 780 N.W.2d 178 (citing *Burg v. Miniature Precision Components, Inc.,* 111 Wis.2d 1, 330 N.W.2d 192 (Wis. 1983)). Indeed, Wisconsin courts impose a fiduciary duty of loyalty upon all "key" employees. *Burbank Grease Servs., LLC v. Sokolowski,* 2006 WI 103, ¶ 42, 294 Wis.2d 274, 304, 717 N.W.2d 781, 796. Whether an employee is a key employee depends on the nature of the employee's duties. *Burbank Grease,* 294 Wis.2d 294, ¶ 42.

Here, the bankruptcy court examined Chapes's duties, responsibilities and compensation, and properly concluded that these factors established that Chapes was a key employee of Pro-Pac. Though on appeal, Chapes points out that he has not conceded his status as a key employee, he does not present any developed argument in opposition to the bankruptcy court's conclusion in this matter. Nor could he. As noted by the bankruptcy court, at his request, Chapes's title was vice-president of sales, and he was in charge of sales and marketing for Pro–Pac. Moreover, prior to being hired, Chapes insisted that he be in complete control of all of his accounts, answerable only to Sarna. Additionally, Pro–Pac expected Chapes to use his contacts in the

industry to help Pro–Pac fill warehousing space. Given his experience and extensive network, Chapes received more generous compensation than other members of Pro–Pac's sales force and various other perks. Such broad responsibilities and duties surely establish Chapes as a key employee and, thus, the bankruptcy court did not err by finding that Chapes owed a fiduciary duty to Pro-Pac.

Having concluded that Chapes is properly categorized as a key employee and, therefore, owed a fiduciary duty of loyalty to Pro-Pac, the court must next ask whether the bankruptcy court erred by finding that Chapes breached that duty with regard to the Vangard deal. This issue requires inquiry into whether the Vangard deal was a valid "corporate opportunity" for Pro-Pac.

### 3.1.2 Breach of Fiduciary Duty and the Corporate Opportunity Doctrine

An employee who owes a fiduciary duty of loyalty assumes a legal obligation "to act solely for the benefit of the principal in all matters connected with the agency, even at the expense of the agent's own interests." *Zastrow v. Journal Commc'ns, Inc.*, 2006 WI 72, ¶ 3 1, 291 Wis.2d 426, 445–46, 718 N.W.2d 51, 60. Among other standards, *Zastrow* teaches that the duty of loyalty imposes upon the employee a legal obligation to: (1) refrain from taking self-interested opportunities; (2) keep privileged information confidential; and (3) fully disclose all information that may be beneficial to the employer. 291 Wis.2d 426, ¶¶ 34, 35, 718 N.W.2d 51. The diversion of an employer's business by a key employee to a competitor violates these standards. *See InfoCorp*, 323 Wis.2d 45, ¶¶ 31, 32, 780 N.W.2d 178. Finding an employee liable for diverting business requires a court to conclude that the

actions of the disloyal employee prevented the employer from realizing a corporate opportunity in which the employer had an interest or expectancy. *See Racine v. Weisflog,* 165 Wis.2d 184, 190, 477 N.W.2d 326, 329 (Wis. Ct. App. 1991). To make this determination, the employer must first demonstrate the existence of a corporate opportunity. *Id.* at 195–96, 477 N.W.2d 326. Once this has been proved, the burden then shifts to the employee to show that, despite the loss of the corporate opportunity, the employee did not breach a fiduciary duty. *Id.*

On appeal, the parties squabble over the appropriate standard of review regarding whether a corporate opportunity existed under the circumstances of this case. Chapes argues that the court must review the issue *de novo*, while Pro-Pac contends that the more deferential clearly erroneous standard is appropriate. Though the question of whether a given corporate opportunity exists is largely a question of fact, *see Havlicek/Fleisher Enterprises v. Bridgeman*, 788 F.Supp. 289, 398 (E.D. Wis. 1992) ("Whether a business opportunity is a corporate opportunity…is a question of fact that should be resolved by taking into account the circumstances surrounding the opportunity at the time it arose."), the question of whether facts fulfill a particular legal stand is itself a question of law. *Suburban Motors of Grafton v. Forester*, 134 Wis.2d 183, 188-89 (Wis. Ct. App. 1986) (citing *Eastman v. City of Madison*, 117 Wis.2d 106, 112, 342 N.W.2d 764, 767 (Wis. Ct. App. 1983)). Thus, to the extent Chapes is arguing that the undisputed and found facts do not support the bankruptcy court's legal conclusions concerning the applicability of the corporate opportunity doctrine, this court shall review the issue using a *de novo* standard. However, to the extent Chapes takes issue

with the factual findings of the bankruptcy court, this court will review those findings using the clearly erroneous standard.

In determining whether a corporate opportunity exists, courts should consider the corporation's ability to take advantage of the opportunity presented to and seized by the employee. *Racine v. Weisflog*, 165 Wis.2d at 194. Among the circumstances to be considered are whether the opportunity relates to the corporation's business purpose and whether the corporation has the ability to pursue the opportunity through its resources. *Id.*[1]

There is little dispute that the Vangard opportunity related to a business purpose similar to the accounts Pro-Pac was already seeking out or accommodating. With the hiring of Chapes, Pro-Pac was attempting to build its business of charging for storage, handling and warehousing of goods and products for manufacturers. The Vangard deal fit squarely within this business as Vangard contacted Chapes to secure a warehouse in which one of its largest customers could store sugar.

---

[1]Chapes argues that the bankruptcy court erred by not taking into account all of the factors that should guide a court in determining the existence of a corporate opportunity as enunciated by the court in *Racine v. Weisflog*, 165 Wis.2d at 194. However, this argument is not persuasive. To be sure, the *Weisflog* court lists numerous factors that a court should consider in the corporate opportunity context. And, while the bankruptcy court did not explicitly discuss each factor in the precise terms articulated in *Weisflog*, its comprehensive analysis at this first prong of the corporate opportunity test is evidence that it considered all of the relevant factors in reaching its determination. Moreover, at this prong of the analysis, the court's main duty is to examine the relationship between the corporation and the alleged corporate opportunity. If a court finds a plaintiff has established that the business opportunity is reasonably related to the corporation's current purposes and activities and that the corporation had the skills or resources to take advantage of the opportunity, then the court has fulfilled its duty at this prong of the analysis. Here, the bankruptcy court did precisely that.

Chapes's main argument on appeal, however, is that Pro-Pac was not in a position to avail itself of the Vangard opportunity. As support for this argument, Chapes cites to his own testimony that Pro-Pac did not have Illinois warehousing space and had not been working on obtaining Illinois warehousing space, as well as that he personally did not believe there was any way Pro-Pac could have provided this warehouse space to Vangard within the given deadline. There are several flaws with this argument. First, the fact that Pro-Pac did not have Illinois warehousing space and had not been working on obtaining Illinois warehousing space, while perhaps placing Pro-Pac at a disadvantage in obtaining such space on short notice, did not necessarily mean that Pro-Pac lacked the ability to take advantage of the Vangard opportunity in some way. Indeed, as the bankruptcy court noted, there was the possibility that Pro-Pac could have found space – via Chapes's connections – whether by contacting a broker, or by leasing or subleasing space from some other entity, such as WOW. In this respect, Chapes's contacts and connections would have been key.

Chapes turns up his nose at this possibility, labeling it as entirely speculative and not sufficient to support the bankruptcy court's determination that Pro-Pac could have availed itself of the Vangard opportunity. However, again, the only evidence Chapes points to in this respect is his own unsupported assertion that he could not have assisted Pro-Pac to lease space on a quick basis to accommodate storage of the sugar. Yet, the record contains evidence supporting quite the opposite. Specifically, Pro-Pac hired Chapes to grow its warehousing business. Chapes had previously worked in Chicago, with many connections in that area. In fact, in pre-employment negotiations with Sarna, Chapes showed him leather binders

filled with business cards and particularly pointed out Van Denend of Vangard as an ally who could assist with securing another lucrative account. What is most telling, however, is that when Vangard needed space immediately to accommodate the storage of sugar for one of its clients, it contacted Chapes to find that space. And, the nail in the coffin – Chapes found that space within the given deadline. Indeed, he diverted the opportunity to WOW because he knew WOW had warehouse space it needed to fill. Thus, it is clear that Chapes had the knowledge and connections to find the required space in the given amount of time.

Moreover, WOW had previously subleased warehouse space for Pro-Pac's use. Thus, it is not out of the question that Pro-Pac may have been able to negotiate the use of WOW's available space through a lease or some other arrangement. And, at the very least, Pro-Pac may have been able to collect a referral fee from WOW for the Vangard deal. In fact, Chapes ultimately received compensation from WOW for the referral of the Vangard deal. This is compensation that could have – indeed, should have – been realized by Pro-Pac, as Chapes owed a duty of loyalty to act solely for the benefit of Pro-Pac in all matters connected with his agency, even at the expense of his own interests. *See Zastrow*, 291 Wis.2d at 445–46. Faced with this evidence, it was not unreasonable for the bankruptcy court to conclude that Chapes could have helped Pro-Pac secure the Vangard deal by finding warehouse space within the 24-hour deadline. Furthermore, whether or not Pro-Pac could actually have found the necessary warehousing space, it could easily have profited from the Vangard opportunity by using it as leverage in its contemporaneous negotiations with WOW concerning rent concessions and WOW's use of Chapes's knowledge and connections in its own warehousing

business. Ultimately, Chapes offers the court no meritorious reason to disturb the bankruptcy court's factual findings or legal conclusions concerning its determination that the Vangard deal was a corporate opportunity for Pro-Pac.

If the corporation can establish the existence of a corporate opportunity, as is the case here, the burden of proof then shifts to the defendant to prove that his actions do not constitute a breach of his fiduciary duty. *Weisflog,* 165 Wis.2d at 195–96. In this second prong of the analysis, consideration must be given to certain equitable factors, such as the relationship between the employee and the corporation, the circumstances before, during, and after the employee seizes the corporate opportunity, and whether the seized opportunity places the employee in direct competition with the corporation. *Id.* Central to this analysis is whether the corporation was "given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present or prospective operations." *Suburban Motors,* 134 Wis.2d at 193. Therefore, the court must next consider whether, despite failing to disclose the Vangard deal to Sarna, Chapes did not violate his fiduciary duty. *See Weisflog*, 165 Wis.2d at 195–96.

Here, again, the court agrees with the bankruptcy court's conclusions that Chapes's failure to disclose the deal to Sarna and Pro-Pac is inexcusable and constitutes a violation of Chapes's fiduciary duty of loyalty to Pro-Pac. In *General Automotive Mfg. Co. v. Singer*, 19 Wis.2d 528, 120 N.W. 2d 659 (Wis. 1963), the Wisconsin Supreme Court – faced with a similar factual scenario – found that a manager's failure to disclose prospective business to his employer and his retention of secret profits from that business violated his

fiduciary duty to act solely for the benefit of his employer. Though the *Singer* court did not couch its decision in terms of the corporate opportunity doctrine, the decision is highly applicable to the circumstances of the present case. For one, much like the manager in *Singer*, Chapes argues that, in his opinion, Pro-Pac would have been unable to take advantage of the business opportunity and, thus, he was free to refer that business to a third-party. Yet, this thinking and conduct on the part of a fiduciary are precisely what the *Singer* court found to be problematic. Indeed, despite the manager's belief that his employer could not meet the needs of the potential customer, the *Singer* court noted that the manager had the duty to disclose all the relevant facts to his employer, and "upon disclosure…it was [his employer's] discretion to refuse to accept orders from [the customer] or to fill them if possible or to sub-job them…" *Id.* at 534-45.

In the case at hand, Chapes was well aware of Pro-Pac's attempts to expand its warehousing business and of its warehouse lease arrangements with WOW. Additionally, he knew about the pending negotiations between Pro-Pac and WOW for his consulting services – which included his network of contacts and referrals – in exchange for rent concessions. Thus, when Chapes received the Vangard referral, he should have disclosed it to Sarna. Sarna might have decided to attempt to find warehouse space on his own or he might have agreed with Chapes that given the short deadline and other issues, the Vangard deal should simply be referred to WOW. Or, Sarna could have concluded that the referral could be used in his negotiations with WOW for rent concessions. The significant point is that it was Pro-Pac's decision to make whether or not to take advantage of the Vangard deal in some way. By keeping the opportunity to himself, rather than sharing it with Pro-Pac, and

in turn by referring it to a competitor, Chapes breached his fiduciary duty of loyalty to Pro-Pac.

Lastly, though Chapes does not raise it as an issue on appeal, it is worth noting that the bankruptcy court properly found that Chapes's referral of the Vangard deal to WOW without disclosing it to Sarna was a substantial factor contributing to Pro-Pac's lost opportunity and damages. Thus, Pro-Pac has sufficiently proved its claim for a breach of fiduciary duty by establishing that Chapes owed it a fiduciary duty, that Chapes breached that duty, and that the breach caused Pro-Pac's damage. *See Berner Cheese Corp.,* 312 Wis.2d at 270. Accordingly, the court will affirm the bankruptcy court's decision in this regard.

### 3.2 Punitive Damages

Chapes next argues that the bankruptcy court erred in awarding punitive damages against Chapes because Pro-Pac provided insufficient evidence that Chapes's actions were in an intentional disregard of the rights of Pro-Pac. "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043(3). Specifically, the evidence must show that the defendant's conduct is: "(1) deliberate, (2) in actual disregard of the rights of another, and (3) sufficiently aggravated to warrant punishment by punitive damages." *Berner Cheese Corp.*, 312 Wis.2d at 280 (citing *Strenke v. Hogner*, 2005 WI 25, 279 Wis.2d 52, 694 N.W.2d 296). This burden does not require a plaintiff to show that defendant intended to cause harm or injury to the plaintiff. *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2008 WI 126, ¶ 77,

314 Wis.2d 560, 757 N.W.2d 803 (citing *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 2005 WI 26, ¶ 61, 279 Wis.2d 4, 694 N.W.2d 320).

Here, there was ample evidence from which the bankruptcy court could have determined that an award of punitive damages was appropriate. First, there is no question that Chapes's conduct disregarded Pro-Pac's agency rights. In other words, Chapes disregarded Pro-Pac's right as a principal to have its agent act in accordance with his duty of loyalty. Moreover, as the bankruptcy court noted, the record contains clear evidence of Chapes's deliberate conduct. Not only did Chapes tout his contacts to gain employment with Pro-Pac – most notably with Vangard's Van Denend – but he was also tasked with using these contacts to cultivate Pro-Pac's warehousing business. Thus, Chapes knew his value to Pro-Pac. Yet, instead of only using these connections to benefit his employer, he used them to benefit WOW – a competitor and a company that he knew was engaged in negotiations with his employer over the use of those very same connections.

Indeed, even Chapes's failure to disclose the Vangard deal to Pro-Pac cannot be considered unintentional. Before the Vangard deal arose, Sarna learned that Chapes had been communicating with WOW and aiding WOW in filling some of its warehouse space. Shocked and upset, Sarna confronted Chapes and informed him that he must disclose any further communications with WOW, adding that "this is too close to home." Nevertheless, when Vangard contacted Chapes with its need for warehouse space, Chapes only communicated the deal to WOW and failed to disclose it to Sarna, even though he was on notice that Sarna wanted to be informed of any contact with WOW. This conduct is exacerbated by the fact that Chapes was fully aware of the rent concession negotiations taking place between WOW and

Page 15 of 18

Case 2:11-cv-01076-JPS   Filed 05/30/12   Page 15 of 18   Document 8

Pro-Pac. In fact, it was Sarna's realization that WOW sought Chapes's warehousing business connections that sparked these negotiations. Thus, despite his protestations to the contrary, Chapes was certainly aware that Pro-Pac would fail to realize some benefit by his diversion of the Vangard deal to WOW without Pro-Pac's knowledge or involvement. Accordingly, the bankruptcy court properly found that there was ample egregious conduct on the part of Chapes to warrant an award of punitive damages in this case.

Lastly, Chapes argues that the $50,000 award of punitive damages is excessive. Chapes contends that the award is excessive because: (1) it is eight times the amount of compensatory damages; (2) the bankruptcy court found that Chapes referred only one corporate opportunity to WOW in breach of his fiduciary duty; (3) at the time Chapes made the referral he did it without the expectation that he would be compensated personally; (4) the referral was not prearranged; and (5) the bankruptcy court did not make any findings regarding Chapes's ability to pay such a large award.

First, the court notes that Chapes has most likely waived any argument over the excessiveness of the damages award as he raises it for the first time, in any substantial depth, in his reply brief. *See Padula v. Leimbach*, 656 F.3d 595, 605 (7th Cir. 2011) (finding that arguments raised for the first time in a reply brief are waived). However, even so, the court finds that the award is not excessive. While the actual damages against Chapes equaled a mere $6,490 – representing the referral fee he received from WOW – the actual damages against WOW equaled $385,000. Thus, taking into account the entirety of the circumstances of this case, an award of $50,000 against Chapes is not at the outer edge of punitive damages awards that have been allowed. In fact, under Wisconsin law, "[t]he test of excessiveness does not

Page 16 of 18

Case 2:11-cv-01076-JPS   Filed 05/30/12   Page 16 of 18   Document 8

necessarily depend upon some arbitrary proportion." *Malco, Inc. v. Midwest Aluminum Sales, Inc.*, 14 Wis.2d 57, 109 N.W.2d 516, 521 (Wis. 1961). Instead, the Seventh Circuit has found that the "most straightforward rationale for punitive damages…that exceed the actual injury done by (or profit obtained by) the tortfeasor…is that they are necessary to deter torts…that are concealable." *Federal Deposit Ins. Corp. v. W.R. Grace & Co.,* 877 F.2d 614, 623 (7th Cir. 1989). In the context of fraud, the Seventh Circuit reasoned that if the average defrauder is caught only half the time, to confront him with a sanction that will make fraud worthless to him and thus deter him, it is necessary that when he is caught he be made to pay much more than he profits on his fraudulent conduct. *Id.* This rationale holds true to the case at hand. Here, as noted by the bankruptcy court, Chapes and WOW actively hid the Vangard referral from Pro-Pac. Moreover, there was evidence in the record indicating that the Vangard deal was not the only incident in which Chapes may have been providing WOW with the value of his connections to the disadvantage of Pro-Pac. Thus, to deter Chapes from any similar future conduct it is necessary to confront him with a sanction in excess of the profit he makes on that conduct. While $50,000 is a large sum, especially for an individual such as Chapes, the damage his actions have caused is arguably much greater than the actual damages award against him personally. Accordingly, for all of the above-cited reasons, the court finds the award of $50,000 against Chapes was not excessive. Therefore, the court will affirm the bankruptcy court's decision in this regard.

    Accordingly,

Page 17 of 18

Case 2:11-cv-01076-JPS   Filed 05/30/12   Page 17 of 18   Document 8

IT IS ORDERED that the bankruptcy court's memorandum decision that Chapes breached his fiduciary duty to Pro-Pac be and the same is hereby AFFIRMED;

IT IS FURTHER ORDERED that the bankruptcy court's memorandum decision awarding $50,000 in punitive damages against Chapes for his intentional disregard for Pro-Pac's rights be and the same is hereby AFFIRMED; and

IT IS FURTHER ORDERED that this appeal be and the same is hereby DISMISSED.

The clerk of court is ordered to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of May, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Page 18 of 18

Case 2:11-cv-01076-JPS   Filed 05/30/12   Page 18 of 18   Document 8